UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

CHAMBERS OF
SUSAN K. GAUVEY
U.S. MAGISTRATE JUDGE

101 WEST LOMBARD STREET
BALTIMORE, MARYLAND 21201
MDD_skgchambers@mdd.uscourts.gov
(410) 962-4953
(410) 962-2985 - Fax

January 17, 2008

W. Bryan Hall, Esq.
81 Baltimore Street, Suite 310
Cumberland, Maryland 21502

Allen F. Loucks, Esq.
Office of the United States Attorney
36 South Charles Street, Fourth Floor
Baltimore, Maryland 21201

Jay C. Hinsley, Esq.
Office of the United States Attorney
36 South Charles Street, Fourth Floor
Baltimore, Maryland 21201

    Re:   James F. Gowans v. Michael J. Astrue, Commissioner of
           Social Security, Civil No. SKG-06-2817

Dear Counsel:

     Plaintiff James Gowans filed this action seeking review, pursuant to 42 U.S.C. §405(g), of the final decision of the Commissioner of Social Security denying him a period of disability, Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") payments.  He has exhausted his administrative remedies.  Currently pending before the Court are cross-motions for summary judgment. (Document Nos. 16-2 and 13-3).  No hearing is necessary.  Local Rule 105.6.

     For the reasons stated below, the Court DENIES plaintiff's motion for summary judgment and GRANTS defendant's motion for summary judgment.  The decision of the Commissioner is AFFIRMED.

1.  **Background**

     Plaintiff filed a Title II application for a period of disability and disability insurance benefits, and a Title XVI application for Supplemental Security Income on April 23, 2004. (R. at 68-74).  The applications alleged disabilities due to seizures, a history of alcohol abuse, acute

1

cholecystitis;[1] hyponatremic dehydration;[2] hypokalemia;[3] abnormal CK-MB;[4] acid reflux;[5] and removal of his sternum, beginning November 5,2002. (R. at 75-84). The Social Security Administration ("SSA") denied the applications on August 2, 2004 determining that, although plaintiff's ability to function had been affected, the seizure condition was not severe enough to keep him from working. The SSA noted that plaintiff could return to the same type of work he had done as a grocery store clerk.

Plaintiff requested a reconsideration of the application on October 4, 2004 claiming that the pain in his back and legs had worsened on or about August 1, 2004. A Disability Report Appeal dated 2005 stated that he was scheduled for two gastrointestinal diagnostic procedures[6] and that "the [sic] think I may have stomach cancer." (R. at 122). Upon reconsideration, the claims were denied on April 23, 2005, stating that because the plaintiff could return to a job similar to his previous employment as a grocery store clerk, there was no medical evidence of a condition that prevented plaintiff from working, and no disability was established.[7] (R. at 44).

Plaintiff requested and received an Administrative Law Judge ("ALJ") hearing on May 22, 2006. (R. at 354-85). Plaintiff appeared with counsel and offered testimony at the hearing. (R. at 358-79). An independent vocational expert, James E. Ganoe, offered testimony about the type of work someone with plaintiff's limitations could perform. (R. at 379-84). Upon consideration of the evidence, the ALJ issued his Decision dated July 5, 2005 that plaintiff did not have a disability as defined in the Social

---

[1] An inflammation of the gallbladder. Dorland's Illustrated Medical Dictionary ("Dorland's") at 354 (31st ed. 2007).
[2] A deficiency of sodium in the blood. Dorland's at 916. Dehydration is defined as a condition that results from excessive loss of body water. Dorland's at 488.
[3] An abnormally low potassium concentration in the blood. Dorland's at 915.
[4] A blood enzyme often useful in the clinical diagnosis of cardiac disease. Dorland's at 436.
[5] Also known as gastroesophageal reflux, a backward flow of stomach contents into the esophagus. Dorland's at 1640.
[6] Plaintiff indicated that he was scheduled for a colonoscopy (examination of the lower part of the intestine) and esophogastroduodenoscopy (EGD) (examination of the upper part of the digestive tract). Dorland's at 394, 655.
[7] The Notice of Reconsideration noted that the evidence showed that Plaintiff's seizures did not occur often enough or with such severity as to prevent him from performing usual daily activities, and that they were controllable through medication and compliance with physician's orders. The Notice also noted that Plaintiff's history of alcohol use had not caused serious liver or memory problems which would preclude him from usual daily activities.

2

Security Act[8] from November 5, 2002 through the date of the decision and therefore was not entitled to a period of disability, DIB, or SSI benefits. (R. at 15-23). On September 1, 2005, the Appeals Council denied the plaintiff's request to review the decision. (R. at 8-11).

2.  Evidence

    A.  Administrative Hearing

    At the ALJ Hearing on May 22, 2006, plaintiff testified about his occupational background and medical history. At the time of the ALJ hearing, the plaintiff was 47 years old. (R. at 358). He graduated from high school in 1977 (R. at 358) and had previously worked as a meat cutter in two grocery stores (R. at 360-61) and as a maintenance worker for the Town of Lonaconing. (R. at 359). He stated that following his incarceration, a condition of his probation was to "look for jobs" (R. at 365) but he believed that "nobody would hire [him]" because of his incarceration. (R. at 365). Plaintiff testified that, following an incident of passing out in the probation office, he was no longer required to look for a job. (R. at 366).

    Plaintiff did not testify that he had seizures; his testimony addressed only black-out episodes and dizzy spells in his past. Plaintiff testified that there were two occasions where he had suffered a black-out: first, at home coming out of the bathroom (R. at 368-69); and second, when he "blacked out" and was involved in a motor vehicle accident. (R. at 368). With respect to the dizzy spells, he testified that they occurred "[s]ometimes once a month," "sometimes once or twice a week," and "every couple of weeks." (R. at 370). He described that he got "totally dizzy and wobbly on [his] feet," and that the sensation would pass in fifteen to twenty minutes once he sat down. (R. at 370). He further stated that the Motor Vehicle Administration ("MVA") intended to suspend his driving privileges because he "didn't get a report from a neurologist" rather than for his reported black-outs. (R. at 369).

    With respect to his gastrointestinal disorders, plaintiff testified that he has gastroesophageal reflux disease (GERD)[9] which makes it "hard to swallow" and "effects his eating." (R. at 375). He stated that his weight "usually stay[ed] normal, around 130" and that he "never gain[ed] anything and never [lost] anything" (R. at 376), although he weighed 155 pounds during his incarceration in 2001 and 2002. (R. at 363-64, 376). During one hospitalization, a feeding tube was inserted for nutrition support; upon its removal after three months, he stated that it

---

[8]Sections 216(I) and 223(d) for the application for a period of disability and DIB; section 1614(a)(3)(A) for the application for SSI.
[9]Supra, note 5.

3

was still "hard to swallow." (R. at 376).

He testified that he had a past history of alcohol abuse (R. at 366), but stated that a hospitalization for alcohol dependence and chronic alcoholism was actually related to a medication he was taking at the time. (R. at 367).

Plaintiff did not indicate that he was taking any prescription or over-the-counter medications for any of his symptoms or disorders. He testified that he gardens, mows the grass, and drives a car. (R. at 377-78). His testimony about his activities of daily living did not include any limitations resulting from his symptoms or disorders alleged in his disability application. (R. at 376-79).

B.  Treatment Records

1.  2002 - 2003

On November 4, 2002, plaintiff was treated and released at the Emergency Department ("ED") at the Sacred Heart campus of the Western Maryland Health System in Cumberland, Maryland for chest wall pain related to a fall in the bathtub a week earlier. (R. at 191-93). On November 5, 2002, plaintiff was brought to the emergency room by the police in connection with a domestic violence incident. On arrival, his blood alcohol level was 0.32 (R. at 181, 183) but had no physical complaints. (R. at 175). He was released into police custody the next day.

On December 13, 2002, plaintiff was brought to the ED from the Allegany County Detention Center complaining of chest pain. (R. at 144). He was admitted to the hospital on suspicion of a myocardial infarction,[10] (R. at 144-45) which was ruled out following the completion of cardiac diagnostic procedures. (R. at 148-49). He was discharged on December 16, 2002 with diagnoses of chest/epigastric pain, most likely due to peptic ulcer disease;[11] macrocytic anema;[12] history of alcoholism; and positive *Helicobacter pylori* test with no prior history of treatment for the bacteria.[13]

---

[10] Gross necrosis, or death, of the cells of the heart as an interruption of blood supply to the area. Dorland's at 948.
[11] An ulcer of the lining of the alimentary tract, usually caused by the action of stomach acids. Dorland's at 2025.
[12] One of various anemias of diverse origin characterized by larger-than-normal blood cells lacking the usual central area of pallor. Dorland's at 80.
[13] A species of the *Helicobater* family of bacteria that causes gastritis and ulcers. Dorland's at 840.

4

On December 2, 2003,[14] plaintiff was seen in the ED following a syncopal episode.[15]  There was no evidence of a seizure. (R. at 165).  He was treated and released the same day, with a discharge assessment of "acute syncope, etiology unknown" (id.) and was instructed to contact his primary care physician, Thomas Devlin, Jr., for follow-up care.

### 2.   2004 - 2005

On February 9, 2004 plaintiff was seen by Mohammad Shafiei, M.D. for a neurological evaluation due to his complaints of recurrent fainting on a referral from Dr. Devlin.  (R. at 155). During that visit, plaintiff voiced no physical complaints other than occasional blurred vision, but reported "six such incidents" of fainting in the two months prior to the evaluation.  (Id.). Dr. Shafiei's impression was "possible anxiety attacks" and "r/o seizure disorder," (R. at 156) although the doctor continued that the plaintiff's history did "not suggest such diagnosis [seizure disorder] at this time." (Id.).  In a follow-up note dated February 10, 2004, Dr. Shafiei stated that he "agree[d] with Dr. Devlin and believe[d] that Mr. Gowans is most likely suffering from anxiety attacks" and that "the possibility of complex partial seizures [could] not be entirely excluded." (R. at 154). He started plaintiff on Depakote[16] "mainly as a mood moderator." (Id.).

Plaintiff presented to the ED on February 17, 2004 complaining of a three-day history of diarrhea and vomiting that prevented him from keeping the Depakote down, and stated that he had suffered a seizure that morning.  Plaintiff denied having any seizure activity since December 2003.  (R. at 158).  The initial diagnosis and impression of the treating physician was "renal failure," although this was not substantiated.  He was treated with intravenous fluids and released the same day in stable condition.  (R. at 157-64).

Two days later, he returned to the ED complaining of extreme weakness and was admitted with initial diagnoses of cholecystitis;[17] hyponatremic dehydration;[18] hypokalemia;[19] abnormal cardiac enzymes with no history suggestive of a

---

[14]There is no evidence of any event in the intervening year in the record.
[15]A temporary suspension of consciousness due to a lack of blood flow; commonly known as fainting.  Dorland's at 1845.
[16]Depakote ER (Divalproex sodium extended-release) is a medication prescribed for acute mania, migraine headaches, epilepsy, and isolated seizures.  Physicians' Desk Reference ("PDR") at 436 (61st ed. 2007).
[17]Supra, note 1.
[18]Supra, note 2.
[19]Supra, note 3.

5

myocardial infarction;[20] history of alcohol abuse; and history of seizure disorder under the care of Dr. Shafiei.  (R. at 205-06). The Depakote was discontinued on the suspicion that it might have contributed to plaintiff's abnormal liver function tests.  (R. at 196).  He complained of dysphagia.[21] A series of diagnostic tests revealed an aspiration[22] with poor pharyngeal contraction, a delay in the initiation of the swallow response, and severe ulcerative esophagitis[23] with a small hiatal hernia.[24]  (R. at 227).  A PEG tube[25] was placed for the temporary management of nutrition and hydration.  (R. at 198-99).  The initial diagnosis of cholecystitis was never substantiated. (R. at 196).  During the course of this hospitalization, plaintiff received Librium[26] in tapering doses to prevent delirium tremens (DTs).[27]

Plaintiff's final diagnoses for the hospitalization were hepatitis[28] due to alcohol and/or Depakote; impaired swallowing of unknown etiology; and a questionable history of seizure disorder. (R. at 194).  Dr. Devlin further noted that plaintiff's overall condition had improved and that, because plaintiff refused transfer to an extended care unit or a nursing home, he was discharged home with the PEG tube.  (R. at 196).

Plaintiff's medical course for the rest of 2004 was uneventful, except for treatment of chronic persistent ingrown toenails (R. at 255-56) in July.

In April 2005 he was referred for outpatient diagnostic

---

[20]Supra, note 4.
[21]Difficulty in swallowing. Dorland's at 587.
[22]Drawing of a foreign substance, such as gastric (stomach) contents, into the respiratory tract during inspiration. Dorland's at 167.
[23]An inflammation of the esophagus, the passage from the mouth to the stomach.  Dorland's at 655.  Ulcerative esophagitis is the inflammation combined with small defects on the surface of the esophagus.  Dorland's at 2024.
[24]Protrusion of the upper part of the stomach through the opening of the diaphragm.  Dorland's at 861.
[25]Percutaneous endoscopic gastrostomy tube, or feeding tube. Dorland's at 1422.
[26]Librium (chlordiazepoxide Hcl) is a benzodiazepine used for the relief of anxiety.  PDR at 3347.
[27]Delerium tremens is an acute transient disturbance in consciousness caused by the cessation or reduction in alcohol consumption, typically in alcoholics with ten or more years of heavy drinking.  Clinical manifestations include rapid heartbeat (tachycardia); wild, agitated behavior; and vivid hallucinations. Seizures are possible.  Dorland's at 490.
[28]Inflammation of the liver.  Dorland's at 856.

evaluations[29] for persistent epigastric pain on the strength of a new patient evaluation[30] and initial assessment of abdominal pain, epigastric; melena; weight loss; and gastroesophageal reflux disease.  (R. at 328, 319-20, 326-28).  The record indicates that abdominal radiographs were normal (R. at 338); no other results were included in the record.  There was a physician report filed with the MVA in June 2005 stating that plaintiff had been involved in two motor vehicle accidents in a six-month period related either to seizures and/or alcohol intoxication.  (R. at 329-31).

   He was hospitalized on December 27, 2005 for a change in urine color.  The initial diagnoses/impressions were pancreatitis and hepatitis secondary to alcoholism; acute renal insufficiency and dehydration; and mild thrombocytopenia.  There was no mention of or treatment for seizure-related incidents.  He was released the following day with discharge diagnoses of alcoholic hepatitis[31] and chronic alcoholism with thrombocytopenia.[32]  (R. at 303).  The treating physician noted that "I did explain to him very clearly that his problems were stemming from his alcoholism" and that he "encouraged him to attend alcoholism treatment," but plaintiff was not interested.  (R. at 304).

   C.   Government Medical Evaluations

   On July 20, 2004 Afaq Ahmad, M.D. performed a consultative examination of plaintiff.  (R. at 257).  At the time of the evaluation, plaintiff "denie[d] any specific complaints like pain, focal motor weakness or problem [sic] with walking."  (Id.).  He stated that he could "walk without any complications" and denied any joint or back pain.  (Id.).  Dr. Ahmad recorded that plaintiff stated that he had stopped working because of domestic problems.  (R. at 258).  Dr. Ahmad's impression was that

---

[29]The plan of care was for plaintiff to undergo an esophagram, an ultrasound of the abdomen, an esophagogastroduodenoscopy ("EGD"), and screening colonoscopy as outpatient procedures to examine the esophagus, stomach, duodenum (top portion of small intestine) and the colon (lower portion of large intestine) using endoscopes and radiographs.  Dorland's at 656, 2027, 655, & 394).

[30]Dr. Devlin ceased being plaintiff's primary care physician sometime in 2004; he stated that "[plaintiff] was assigned a different PCP by Md. Physicians Care."  (R. at 272).  Dr. Norman Wood, D.O. apparently assumed care of plaintiff in April 2005.

[31]Inflammation of the liver resulting from alcoholism, often a precursor of cirrhosis, a chronic liver disease clinically manifested as long latent periods followed by sudden abdominal swelling and pain; throwing up blood; swelling in the lower extremities; or jaundice, a yellowing of the skin.  Dorland's at 856, 371.

[32]Thrombocytopenia is a decrease in the number of platelets, the blood component responsible for clotting (coagulation), in the blood.  Dorland's at 1947.

7

plaintiff had no "functional impairment on physical exam." (R. at 259-60). Dr. Ahmad's diagnoses/impressions were history of alcoholism; history of alcoholic hepatitis; and status post PEG tube placement and subsequent removal for dysphagia of unknown etilogy. (R. at 259). Other than noting that plaintiff had a "history of possible seizure disorders," Dr. Ahmad did not further mention the condition in his evaluation. (R. at 258, 259-60).

A Physical Residual Functional Capacity ("RFC") Assessment completed on July 23, 2004 by William Hakkarinen, M.D. listed seizure disorder as the primary diagnosis, and alcoholic hepatitis as the secondary diagnosis. There were no exertional limitations established; Dr. Hakkarinen noted that there was no evidence of attacks related to the seizure disorder, (R. at 263)and that because the plaintiff's bilirubin level[33] was below 2.0 mg/dL, there was no evidence of liver failure. (Id.). There were no manipulative, visual, or communicative limitations established. (R. at 265-66). Postural limitations of climbing on ladders or scaffolds were established on the basis of seizure precautions (R. at 264), as were limitations on "even moderate exposure" to unrestricted heights and open flames. (R. at 266).

Plaintiff was examined again by Dr. Ahmad on behalf of the Maryland Disability Determination Services on March 3, 2005. Plaintiff's chief complaint was severe gastroesophageal reflux disease,[34] and he stated that he experienced a burning sensation in his throat if he sat for thirty minutes. He also stated that he felt dizzy and lost his balance whenever he walked further than three to six feet. Plaintiff reported that he could lift one-hundred (100) pounds and carry that weight six feet before getting dizzy. He did not require any assistive devices for walking. (R. at 283). His impressions included "severe gastroesophageal reflux disease; status post PEG tube placement for possible neurological dysphagia; [and] dizziness, query etiology. Possible vertigo." (R. at 285). Dr. Ahmad determined that plaintiff had no "functional impairment on physical exam" (R. at 285) and noted that plaintiff was taking Prilosec[35] before meals for his dysphagia and reflux disease.

A RFC assessment completed by Sami Brahim, M.D. on April 18, 2005 revealed the same findings: plaintiff had no exertional, visual, or communicative limitations, and postural and environmental limitations were restricted to climbing on ladders,

---

[33]Bilirubin is a substance normally produced when red blood cells breakdown. An excess amount circulating in the blood can cause jaundice, or a yellowing of the skin. Dorland's at 218.

[34] Supra, note 5.

[35] Prilosec (brand name for omeprazole magnesium) is an over-the-counter medication used for the relief of frequent heartburn. It acts by stopping the production of stomach acids.

scaffolds, or ropes, and avoidance of unrestricted heights and open flames. (R. at 287-92).

2. **ALJ's Findings**

In evaluating the plaintiff's claim for disability, the ALJ followed the sequential five-step process set forth in the Code of Federal Regulations, 20 C.F.R. §§404.1520(a) and 416.920(a).

The first step requires that the plaintiff demonstrate that he has not been engaged in substantial gainful activity for the period of the alleged disability. 20 C.F.R. §§404.1520(b) and 416.920(b). Here, the ALJ determined that the plaintiff had not engaged in substantial gainful activity at any time relevant to this decision. (R. at 17, citing 20 C.F.R. §§404.1520(b), 404.1571 *et seq.*, 416.920(b), and 416.971 *et seq.*).

The second step requires the plaintiff to demonstrate that his impairment, or a combination of impairments, is "severe" as defined in sections 404.1421 and 416.921. 20 C.F.R. §§404.1520(c) and 416.920(c). The ALJ determined that the plaintiff had two severe impairments: a history of possible seizure disorders, and alcohol dependence in remission pursuant to §§404.1520(c) and 416.920(c) (R. at 17). The ALJ did not find that the plaintiff's gastrointestinal problems, back and leg pain, and absence of his sternum were "severe" because their effects on plaintiff's functional status was minimal. With respect to the severity of the gastrointestinal problems, the ALJ noted that the treating and evaluating physicians had reported that the medication Prilosec was effective in managing the symptoms. (R. at 18). Moreover, the ALJ stated that the plaintiff's gastrointestinal disorders did not meet the minimum duration required to be considered severe. (Id.) With respect to the plaintiff's back and leg pain, the ALJ noted that there was no complaint made by the plaintiff during the July 2004 disability determination physical examination, and that the examiner found that there was no functional physical limitation. (Id.) Plaintiff's sternum had been removed a number of years prior to the precipitating event; in response to the ALJ's questioning during the hearing, the plaintiff stated that other than occasional pain, the bone's absence was not a limiting factor. (Id.)

At the third step, the plaintiff must establish that his severe impairments meet or equal the criteria of one of the impairments in the Listing of Impairments ("LOI") found in 20 C.F.R. Part 404, subpart P, appendix 1. 20 C.F.R. §§404.1520(d), 416.920(d). Here the ALJ concluded that the none of the plaintiff's impairments, considered singly or in combination with other impairments, met or equaled the criteria in the LOI. (R. at 19). With respect to the plaintiff's possible seizure

disorder, the ALJ determined that the medical record did not support any form of epileptiform condition – the record provided anecdotal references to the possible seizure condition, but there was no evidence of a seizure pattern.  (Id.)  Moreover, the ALJ stated that even if he accepted the anecdotal evidence of possible seizure activity, the frequency of the seizures, all self-reported, did not meet the minimum criteria set forth in §§11.02  or 11.03.[36]   *(Id.)*

The ALJ addressed plaintiff's history of alcohol dependence extensively, noting that the plaintiff had an equally long history of minimizing his alcohol use.  (R. at 19).  The ALJ stated that he gave the plaintiff the benefit of the doubt with respect to his varying accounts of alcohol consumption in the period leading up to the application for disability and the subsequent hospitalizations and examinations, and determined that the plaintiff was in remission at the time of the hearing.  *(Id.)*  The ALJ stated that he considered the various impairments available in §12.09,[37] but did not find sufficient evidence to meet the criteria required for any of the listings.  *(Id.)*  The ALJ's opinion provided an episode-by-episode examination of the medical record for each of the plaintiff's reported black-outs, dizziness, and fainting spells as the basis for the determination that the criteria for impairment were not met.  (R. at 19-20).

Step Four of the administrative process requires the ALJ to consider whether the plaintiff retains the residual functional capacity ("RFC") to perform past relevant work if a listing of impairment is not met.  20 C.F.R. §§404.1520(e), 416.920(e).  Here the ALJ determined that the plaintiff had the RFC to perform medium work, with a few noted exceptions.  (R. at 21).  The ALJ relied upon the opinions and reports of the state agency physicians who determined that the plaintiff had only limitations with respect to climbing ropes, being on scaffolds, or any other activity which would expose him to unrestrained or unprotected heights, and the operation of heavy machinery.  However, given the plaintiff's past relevant work was as a meat cutter and a maintenance worker, the ALJ determined that the plaintiff was unable to perform any past relevant work.  20 C.F.R. §§404.1565, 416.965.

If the plaintiff's RFC prevents him from performing his past relevant work, the burden shifts to the Commissioner at the fifth and final step.  Pass v. Charter, 65 F.3d 1200, 1203 (4th Cir. 1995); McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir 1983).

---

[36] 20 C.F.R. Part 404, subpart P, appendix 1, section 11.00, Neurological; 11.01 Category of Impairments, Neurological; 11.02, Epilepsy.

[37] 20 C.F.R. Part 404, subpart P, appendix 1, section 12.00, Mental Disorders.

The agency must show that, in light of such vocational factors as age, education, work experience, and RFC, the plaintiff is capable of other alternative work in the national economy. 20 C.F.R. §§404.1520(f), 416.920(f).  Here, the ALJ determined that because the plaintiff was forty-three (43) years old at the date of the alleged onset of disability, he was therefore defined as a younger individual pursuant to 20 C.F.R. §§404.1563, 416.963; that the plaintiff had at least a high school education and was able to communicate in English, pursuant to 20 C.F.R. §§404.1564, 416.964; and that transferability of job skills was not material to the determination of disability due to the plaintiff's age. 20 C.F.R. §§404.1568, 416.968.  (R. at 22).  As such, he found that the range of evidence supported a finding that the plaintiff could perform jobs that exist in significant numbers in the regional and national economy, including a stock clerk (4,000 jobs in the region; 325,000 jobs nationally); kitchen helper (3,100 jobs in the region; 475, 000 jobs nationally); and laundry worker (2,150 jobs in the region; 30,500 jobs nationally).  (R. at 23).  He also noted that the vocational expert had testified that there were a significant number of jobs at a light exertional level with the same RFC.  (Id.)

3.   **Standard of Review**

The primary function of this Court on review of Social Security disability determinations is not to try plaintiff's claims *de novo*, but rather to leave the findings of fact to the agency and to determine upon the whole record whether the agency's decision is supported by substantial evidence. King v. Califano, 599 F.2d 597, 599 (4th Cir. 1979); Teague v. Califano, 560 F.2d 615 (4th Cir. 1977).  Substantial evidence is more than a scintilla but may be less than a preponderance of the evidence presented.  Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966).  It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion and must be sufficient to justify a refusal to direct a verdict was the case before a jury.  Teague v. Califano, 560 F.2d at 618; Johnson v. Califano, 434 F.Supp. 302 (D. Md. 1977).

However, the inquiry does not end there.  "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law," Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).  The deferential standard of review applied to the agency's findings of fact does not apply to conclusions of law or the application of legal standards or procedural rules by the agency. Wiggins v. Schweiker, 679 F.2d 1387 (11th Cir. 1982).

Finally, it must be noted that hearings on applications for Social Security disability entitlement are not adversary proceedings.  Easley v. Finch, 431 F.2d 1351 (4th Cir. 1970).

Moreover, the Social Security Act is a remedial statute and it is to be broadly construed and liberally applied in favor of beneficiaries. <u>Dorsey v. Bowen</u>, 828 F.2d 246 (4th Cir. 1987). A claimant is entitled to a full and fair hearing and failure to have such a hearing may constitute sufficient cause to remand the case. <u>Sims v. Harris</u>, 631 F.2d 26 (4th Cir. 1980).

4. **Discussion**

There are three arguments on appeal. First, plaintiff complains that the ALJ did not properly evaluate plaintiff's impairments, specifically the anxiety attacks and the gastrointestinal problems, at Step Two and Three. (Pl.'s Mem. at 10). Second, plaintiff complains that the ALJ did not properly consider Listings 5.05 (chronic liver disease) and 5.08 (weight loss due to gastrointestinal disease) in his decision. (Pl.'s Mem. at 12 - 13). Third, plaintiff complains that the ALJ erred in finding that plaintiff's statements were not entirely credible. (Pl.'s Mem. at 15).

Based on a review of the whole record, this Court finds that the ALJ properly evaluated plaintiff's impairments, specifically the anxiety attacks at Step One; that the ALJ properly evaluated the plaintiff's gastrointestinal problems as a medically determinable impairment at Steps Two and Three; and that the ALJ did not err in finding that plaintiff's statements regarding the extent and frequency of his dizzy spells were not entirely credible.

    A.    The ALJ properly evaluated the plaintiff's impairment of anxiety attacks because the plaintiff failed to meet his burden of proof in establishing the condition as a severe impairment.

The plaintiff charges that the ALJ did not adequately evaluate the severity of the anxiety attacks and gastrointestinal problems during the second step of the five-step analysis. The second step establishes whether the plaintiff has a medically determinable impairment that is severe, singly or in combination, and thus have more than "such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience." <u>Reichenbach v. Heckler</u>, 808 F.2d 309, 311 (4th Cir. 1985); 20 C.F.R. §416.920(c). An impairment is categorized as severe under the regulations if it significantly limits the individual's ability to perform basic work activities. 20 C.F.R. §§404.1521 and 416.921; SSR 85-28, 96-3p, and 96-4p.

The plaintiff failed to meet his burden of proof at Step Two that he has medically determinable severe anxiety attacks. The first mention of plaintiff's anxiety attacks in the record is on

February 9, 2004 when plaintiff was examined by Dr. Shafiei, a neurologist, upon the referral by Dr. Devlin.  (R. at 156).  Dr. Shafiei's notes reveal that plaintiff stated that "he was told he was probably suffering from 'panic attacks.'" Dr. Shafiei's impression was "possible anxiety attacks; r/o seizure disorder."  (Id.).  Dr. Shafiei's follow-up note, dated February 10, 2004, stated that he "agree[d] with Dr. Devlin and believe that Mr. Gowans is most likely suffering from anxiety attacks."  (Id.)  However, Dr. Devlin's records did not mention anxiety attacks; his diagnoses were limited to acute chemical hepatitis (alcohol versus reaction to Depakote); unexplained transient impaired swallowing; suspected peripheral neuropathy of feet; history of seizure disorder per neurologist, initial seizure not alcohol-induced (plaintiff was incarcerated at the time); and recurrent peptic ulcer disease and positive *H. Pylori*.  (R. at 272).

There is no mention of anxiety attacks in the report of the first government medical examination on July 20, 2004 (R. at 257-60), nor is there mention in the second government medical examination on March 3, 2005.  (R. at 283-86).  Plaintiff did not testify to the condition in the ALJ's hearing on May 22, 2006.  Plaintiff's Memorandum in support of his Motion for Summary Judgment merely mentions the issue – "[n]ot discussed were the anxiety attacks diagnosed by Dr. Devlin, plaintiff's treating physician, and Dr. Shafiei, a consulting neurologist."  (Pl.'s Mem. at 11).  It appears that the examining and treating physicians determined that plaintiff's symptoms were caused by either anxiety or seizures.  Other than the prescription of Depakote as a mood modulator, no other course of treatment or diagnostic evaluation was ordered.

The law is clear that a "mere diagnosis ... says nothing about the severity of the condition." Higgs v. Bowen, 880 F.2d 860, 863 (6th Cir. 1988).  As the Government states, the record does not support plaintiff's assertion that "he had significant anxiety-related limitations."  (Resp't Mem. at 13).  And, here, of course, there was not even anything close to a definitive diagnosis of an anxiety disorder.  "Dr. Shafiei's 'possible' diagnosis was ... not seconded by [plaintiff's] treating sources, who instead attributed his syncopal episodes and other reported symptoms to his abuse of alcohol."  (Id.).  "When there is no allegation of a physical or mental limitation or restriction of a specific functional capacity, and no information in the case record that there is such a limitation ... the adjudicator must consider the individual to have no limitation ... with respect to that functional capacity."  SSR 96-8p, 1996 WL 374184.  Accordingly, this Court finds that because the plaintiff failed to meet his burden of proof at Step Two, the ALJ did not err in not finding that condition to be "severe."

   B.   The ALJ properly evaluated the severity of plaintiff's

13

>           gastrointestinal problems as a medically determinable
>           impairment at Step Two and at Step Three.

Step Two of the five-step process requires the plaintiff to demonstrate that his impairment, or a combination of impairments, is "severe" as defined in sections 404.1421 and 416.921.  20 C.F.R. §§404.1520(c) and 416.920(c).  Step Three requires the plaintiff to establish that his severe impairments meet or equal the criteria of one of the impairments in the LOI.  The Court on appeal cannot determine whether findings are supported by substantial evidence unless the agency explicitly indicates the weight given all the relevant evidence. Gordon v. Schweiker, 725 F.2d 231 (4th Cir. 1984).  Failure of the administrative law judge to articulate the reasons underlying his actions may be cause for remand or reversal. Cook v. Heckler, 783 F.2d 1168 (4th Cir. 1986); Murphy v. Heckler, 810 F.2d 433 (4th Cir 1987).

The plaintiff says the ALJ erred in failing to find his gastrointestinal problems "severe."  The ALJ relied on the "claimant's testimony, the medical evidence of the record and the record in its entirety" in determining that the problems were not "'severe,' in that they have caused only minimal limitations on his functioning." (R. at 18).  The ALJ found that "the claimant does have some gastrointestinal problems.  However, it is a very rare case in which gastrointestinal conditions result in a total inability to perform any and all types of substantial gainful activity."  (Id.).  The plaintiff challenges the sufficiency of this analysis and asserts that the ALJ should have considered and expressly discussed Listings 5.05 and 5.08 in his opinion. (Pl.'s Mem. at 12-13).  Plaintiff is correct that the ALJ did not engage in a criterion-by-criterion analysis of the evidence under either of those listings.  But that was not required here.

The ALJ is only required to explicitly identify and discuss the relevant listing of impairments if there is "ample evidence in the record" to support the determination that the impairment meets or is medically equivalent to one of the listed impairments. Huntington v. Apfel, 101 F. Supp. 2d 384. 391 (D. Md. 2000).  This Court finds that there was not ample evidence presented by plaintiff to require that the ALJ review Listings 5.05 and 5.08 in determining the severity of plaintiff's gastrointestinal problems.  Plaintiff bears the burden of demonstrating that the impairment is severe and conclusively disabling through the presentation of medical evidence alone, and that it meets every specified medical criteria set forth in the LOI. Sullivan v. Zebley, 493 U.S. 521, 530 (1990).  The Government correctly points out "Mr. Gowans has not even attempted to meet . . . this burden.  (Resp't Mem. at 15).  Moreover, the medical evidence in the record does not, as the Government also pointed out in its Memorandum, support a

14

disability under either Listing 5.05 or 5.08: for example, under Listing 5.05, plaintiff's bilirubin did not reach and persist at the required level for the requisite five months; his liver function test results were within normal limits; and the hepatitis resolved with the cessation of alcohol ingestion. (Resp't Mem at 15-16).  The treating and examining physicians reported that plaintiff's pattern of gastrointestinal problems were exacerbated when plaintiff ingested alcohol, and required only an over-the-counter (not prescription) medication for symptomatic relief.  (R. at 18).  Under Listing 5.08, although the record notes one instance where plaintiff weighed 100 pounds (R. at 327), plaintiff's weight is otherwise characterized as stable. (R. at 142, 204, 376).  He denied "recent weight loss or weight gain" (R. at 258), and testified that he "usually stay[ed] normal, around 130" and "never gain[ed] anything and never [lost] anything."  (R. at 376).  Plaintiff did not testify that he had any limitations or functional restrictions related to his gastrointestinal problems.  Thus, the ALJ's evaluation was sufficient and appropriate and the evidence was not such to compel a criterion-by-criterion analysis of Listings 5.05 and 5.08 among many others.

    C.    The ALJ did not err in finding that plaintiff's statements regarding the extent and frequency of his dizzy spells were not entirely credible.

Plaintiff challenges the ALJ's finding that plaintiff's statements were not entirely credible.  In the opinion, the ALJ concluded that he "[did] not find the claimant to be entirely credible and [did] not fully accept his subjective statements concerning his symptoms and limitations. The claimant has medically determinable impairments that could reasonably be expected to cause some of the symptoms described." (R. at 21). Thus, the ALJ did satisfy Step One, finding medically determinable impairments that could cause some of the symptoms, including dizziness, but "not to the frequency and severity alleged... and [did] not accept medical findings or opinions that [were] based solely or primarily on the claimant's subjective complaints."  (Id.)  The ALJ articulated that the objective medical evidence failed to support any sort of epileptiform or seizure condition, that there was no documentation or description of the plaintiff's seizure patterns, and that even if one accepted the plaintiff's self-reported anecdotal evidence, the frequency of the seizures did not meet the criteria required by Listings 11.02 and 11.03.  (R. at 19).

The plaintiff relies on Hines v. Barnhart, 453 F.3d 559 (4th Cir. 2006) to assert that the ALJ erred in determining that plaintiff's description of his exertional limitations was unreliable because there was no objective medical evidence to support the complaint.  (Pl.'s Mem. at 18).  He reasons that,

like Hines, his subjective evidence of dizziness alone should be sufficient to prove that he has a disabling limitation. Id. This reliance on Hines is misplaced. The Court agrees with plaintiff that Hines does stand for the proposition that a claimant can rely exclusively on subjective complaints, in some circumstances. However, the Fourth Circuit in Hines also notes that,"[a]lthough a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence." Hines, 453 F.3d at 565. Therefore, even though plaintiff's subjective complaints may demonstrate the requisite intensity and severity at step two, if there is significant evidence that contradicts his subjective complaints, the ALJ may, indeed must, consider that evidence in conjunction with the subjective evidence. The plaintiff in Hines was able to prove through objective medical evidence that he was afflicted by the unique disease of Sickle Cell Disease ("SCD"), and because there is no way for an SCD patient to objectively demonstrate pain, he was allowed to exclusively rely on subjective evidence of pain. Id. at 562 and 565. Further, and critically for our purposes here, the Commissioner in Hines did not present any objective evidence that contradicted the subjective complaints of Hines. Hines, 453 F.3rd 559. In the case at bar, there is a significant amount of evidence in the record that either contradicts plaintiff's subjective complaints or demonstrates inconsistency in plaintiff's subjective complaints and should be taken into account by the ALJ. Consequently, Hines is not dispositive here.

The ALJ cited evidence throughout the record of plaintiff's inconsistency of statements and testimony. (R. at 21). He noted, in one instance, that the "claimant simply reported falling in the tub while cleaning it, which is quite different from his testimony [that he passed out once when walking out of the bathroom]." (R. at 20). In another example, the ALJ noted that the "claimant denied a history of alcohol abuse" even though plaintiff "admitted drinking a pint of whiskey that day and two to three beers everyday after work." (Id.)

In determining credibility, SSR 96-7p requires that the ALJ consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians about the symptoms and how they affect the individual, and any other relevant evidence in the case record. An individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his ability to work may not be disregarded solely because they

16

are not substantiated by objective medical evidence.  However, an individual's statement about his symptoms is not enough in itself to establish the existence of a physical or mental impairment or that the individual is disabled.  (Id.)

No symptom or combination of symptoms can be the basis for a finding of disability, no matter how genuine the individual's complaints may appear to be, unless there are medical signs and laboratory findings demonstrating the existence of a medically determinable physical or mental impairment that could reasonably be expected to produce the symptoms.  (Id.)

In his opinion, the ALJ noted that he "considered all symptoms and the extent to which these symptoms [could] reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and 416.929 and SSRs 96-4p and 96-7p." (R. at 21) He continued that he also "considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and 416.927 and SSRs 96-2p and 96-5p, and 96-6p" (Id.)in concluding that the "claimant was not entirely credible based on come of his statements and other evidence in the record."  (Id.).  There is no evidence of positive neurological findings or results consistent with the possibility of a seizure disorder.  There is no evidence in the testimony or in the record, objective or subjective, of any factors that precipitated and aggravated the symptoms other than the plaintiff's statement during the second disability determination medical examination (R. at 283), nor is there any evidence of any medication or treatment that the plaintiff has taken which alleviates the dizziness.  The plaintiff testified that the dizziness passes after fifteen to twenty minutes if he sits or lies down (R. at 370) and that the episodes "go away real quick" if he "get[s] down real quick."  (Id.).

Consistency of the plaintiff's statements is a strong indication of his credibility, and the ALJ addressed that issue in his decision.  He noted that the plaintiff had minimized his alcohol use and denied alcohol abuse to his treating physicians and throughout the disability process.  (R. at  21).  He cited specific examples from the medical evidence which included plaintiff's contemporaneous subjective account of the role alcohol had, or had not, played in any one of the medical incidences.  (Id.).  He articulated the inconsistencies in plaintiff's own statements made in connection with his claim for disability benefits with statements he made at the time of receiving medical attention noted throughout the record.  Although the lack of consistency between plaintiff's statements does not necessarily mean that the individual's statements are not credible, the ALJ considered the record in its entirety to determine that the variations in the statements were not related to any other factors.

17

The ALJ did not err in finding that the plaintiff's statements were not entirely credible, and considered plaintiff's subjective accounts of his dizziness with the objective medical evidence presented.  As such, his determination, following the five-step process required by 20 C.F.R. §§404.1520(a) and 416.920(a), that the plaintiff is not disabled and is able to perform work-related activities is consistent with the substantial medical evidence proffered.  His decision to add exertional and environmental limitations to the plaintiff's RFC reflects the weight and credibility he afforded the plaintiff's subjective statements about his dizziness.

5. **Conclusion**

For the reasons discussed above, the Court finds that the Commissioner's determination that plaintiff was not disabled within the meaning of the Social Security Act was reasonable and supported by substantial evidence in the administrative record.  The Commissioner's decision is AFFIRMED.[38]

Despite the informal nature of this letter, it should be flagged as an opinion and docketed as an Order.

                                        Sincerely yours,

                                        /s/

                                        Susan K. Gauvey
                                        United States Magistrate Judge

---

[38] This Court notes that the Government provided an excellent analysis of the matters of fact and law in its memorandum, which was helpful to the Court in reaching its decision.